Good morning, your honors. Michelle Carey, C.A.R.E.Y. on behalf of the defendant, Appellant G.W. Nitzsche. And good morning, your honor. Peter Orgaver on behalf of Martice Davis, the plaintiff, cross-appellant. Okay. All right. So, 15 minutes apiece. Time for rebuttal? Yes, I'd like to reserve five minutes. Five minutes? Okay. So I can address the cross-appeal as well. Okay. All right. Thank you. We're ready to proceed. Good morning, and may it please the court. This case involves a water loss at Ms. Davis' property. And I won't go into all the details because I'm sure that you are familiar with the facts. So I will just get right into the issues that CERVPRO is the doing business as name of G.W. Nitzsche. CERVPRO is a franchise that does emergency fire and water mitigation services. So the issues raised by, I'll refer to G.W. Nitzsche as CERVPRO if that's okay with your honors. Sure. So the issues raised by CERVPRO, the first issue is whether or not CERVPRO was entitled to a set-off from the proceeds that Ms. Davis received from a settlement from other parties in the case. The second issue is whether or not the trial court erred in awarding damages to Ms. Davis on her conversion claim for the sentimental value of her personal items. And the third issue is whether or not the trial court erred in denying CERVPRO's counterclaim in its entirety. So I have a question on the set-off. Yes. It's my understanding from reading the briefs that the way this has happened is Hartford decides that they're going to be covering the damage, right, at the beginning, right, or allegedly going to cover the damage, right? They contact the middle person, I think it's Mr. Murphy, right? Mr. Murphy. Crawford. Crawford. Crawford, yes. I apologize, sorry. And then they contact CERVPRO to go out and take a look at the property, right? That is correct, yes. Why weren't they also included in the settlement process? I mean, technically CERVPRO, through agency principles, is working on behalf of Hartford. They see Hartford as the principal that's going to end up paying them under the contract. So why weren't they part of the settlement agreement? Why wasn't CERVPRO part of the settlement? Right. We did participate in the mediation. Okay. And? We were not able to reach settlement. Okay. All right. That answers my question. And I'd like to address something you just said. That is, it is Ms. Davis' position that Hartford was CERVPRO's customer. But a plain reading of the contract shows that Ms. Davis was CERVPRO's customer. The contract very clearly states, and we'll get into the contract issues in a moment, because there are some potential discrepancies or disputes about that. So why did CERVPRO initially bill Hartford then? We actually billed Ms. Davis. The invoices and the backup documentation are to Ms. Davis. We submitted them to Hartford because Hartford was the third-party insurance carrier for Milton Coal and Coal Construction, who was the contractor that caused the water loss to occur in the first place. No, Ms. Davis didn't hire CERVPRO. She didn't arrange for CERVPRO to come to her property, did she? She didn't arrange for them to come to the property, but she signed all of our contract documents and allowed CERVPRO to come into her home and do the work. She was there present every day observing the work. She signed. She admits that she signed the contract. She sued for breach of that contract. How could it be a contract if there's no specific terms, such as the work to be performed, on what schedule, and the price to be paid by whom? So if you look at the customer information form, and I can get you a site for that, which is part of our contract document package, it specifically gives a reason why we can't give a price. When you're dealing with a water loss, we have no idea what's going on behind the walls. We have no idea how far the water has penetrated. So we actually have a clause in our contract documents in the customer information form for water damage that specifically says we cannot provide an estimate until we are done with the work because we cannot tell the extent of the damage. So then how can there be a meeting of the minds, which is a seminal requirement of all contracts? So I realize this is an unreported case, but the case of Dynaclean is actually very close to our case. That's a second district case. It's unreported, but it is also a water and fire remediation service that had a very similar contract to ours. And the court there found, for the very reason that I just articulated, that it's impossible to give a price up front. It's impossible to give a time frame up front. However, again, in our customer information documents that Martise Davis signed and admits that she signed, it indicates in those documents that it will take approximately five to seven days to complete the work and that we will provide an estimate at the end. And did you provide an estimate? We did. And how much was the estimate? There were two phases of the work. The first phase was the actual water extraction remediation drying out phase. The second phase of the work, and it was occurring simultaneously. I don't mean to indicate that it was separate in time. But we treat the second part differently, which is what we call contents, which is we had to take virtually all of Ms. Davis' personal belongings out of the home to make room to do the work and also to make room for her. So how much was the estimate? So the water remediation estimate, just give me one moment. The total between the two, I believe, is about $45,000. I think it's separated around $20,000 for the water remediation work and approximately $30,000 for the contents, which includes storage of the items. And did they ever complete what they were going to work on? So we were contracted to do the water remediation extraction drying out process. Our employees had perhaps a couple more days of work, and that is when Mr. Cole and Cole Construction were still on the premises performing work, started to remove the chimney from the bottom up. And our crew felt it was unsafe to be in the building and thought it was going to become structurally unsound. And so we reported this to Ms. Davis. She agreed with us. She reported it to Hartford Insurance. Her and Mr. Cole got into a big argument about it. Yeah, but the question is they didn't finish the job, right? We did not. Okay. So I would like to point out that Ms. Davis provided a recorded statement to Hartford Insurance just a couple months after the water loss occurred. And in that recorded statement, which is in the record, let me get you a site. The recorded statement is in the record at 1659 to 1720. And what I'd like to point out is that Ms. Davis indicates to Hartford Insurance just a couple months after the loss while everything is still occurring that she asked ServPro not to do anything further. And that is at 1713 in the record. Okay. She said her attorney told her let Cole do what he's going to do, and then ServPro can come back later. In the meantime, Hartford Insurance tells everyone we're investigating this claim. The reasons for that investigation are somewhat articulated by the investigator who's taking the recorded statement from Ms. Davis. She indicates that Mr. Cole is telling people that she's his wife, that Mr. Cole lives at the property. There are concerns about what construction he's performing at the time when Hartford Insurance's job here is to remediate the loss. And Hartford Insurance is expressing to Ms. Davis during this interview that there's quite a bit of work going on at the premises. I have a question about the agreement, the agreement that was entered between Ms. Davis and ServPro. Yes. All right. Do you think Ms. Davis normally and voluntarily waived her right to her jury trial? I believe she did because she signed the contract. She admits she signed the contract. She brought a claim for breach of contract in a verified pleading, attached that contract to the verified pleading, and she did not raise some other waiver arguments she could have raised at the time that the motion to strike the jury demand was made. So it was fully briefed before Judge Flannery, and he agreed with ServPro that there is a valid jury waiver in the contract. I would like to point out that jury waiver was also upheld in a similar case in front of Judge Kovasiak, which is also on appeal before the First District. Okay. And if we were to agree with Ms. Davis, what is the appropriate relief here with regards to the jury waiver? If you agree with Ms. Davis that it was improper, then I think you would have to remand for a jury trial. I don't agree with that or concede that. Right. I understand. That would be a result, I presume. Okay. So I'm sorry. Do you have any further questions before I get back to the set-off argument? Well, we read the brief, so I would get to the arguments that you want to make. Okay. Within your time. What I would like to point out is that Ms. Davis would like you to accept the argument that the $300,000 she received did not compensate her for all of her losses, and ServPro's position is, yes, it did. Her own testimony is that she received $300,000. What did that $300,000, if you know, what did that $300,000 cover? I can't tell you what Hartford's intention was because I wasn't privy to that settlement, and it was not the court did not cover. What injury did it cover? It covered the water loss that was created by Mr. Cole. It did not cover the loss of her contents. I don't know that. I don't know that. Not the same injury, right? It had nothing to do with that injury, did it? My position is that it's a single injury because it's a single event that caused all of the damage. It's a single event. In Ms. Davis's own words, this has been a domino effect. That is in the record in 1698. The only reason we removed her property from the building was to be able to work in the property. She also admitted that she didn't believe the work could have been done with the contents in her home. Also, I'd like to note that Ms. Davis did give express permission. She signed a move-out document expressly giving us permission to take the property from her home. But she wouldn't give you express permission to retain the property that you took from her home, right? She did not, but I would like to point out that the mere detention of property that is not wrongfully taken does not constitute conversion. And that is cited in the brief. In Ms. Truck's case? Yes. So, it's our position that it is a single injury. When she testified to her damages, she testified that her damages amounted to approximately $205,000 to $225,000. That's in total. That covers the contractor she paid for. That covers the personal property she replaced. That's everything. So, she already received $300,000. Her own testimony is that her damages were at most $230,000. So, to recover further funds from ServPro would absolutely constitute a windfall. But do we know if that $300,000 was, as happens with insurance companies, they might agree that there was damage, but they're only going to cover so much. So, do we know if that was intended to cover every damage that she sustained, or it was just a partial, like, this is as far as we're going. We're going to just give you $300,000 and you're responsible for the rest of the damage. What we know is what Ms. Davis testified to, which is that $300,000 was only for the top floor. Okay. Now, I'd like to point out that her own testimony and recorded statement indicates that she paid Mr. Cole to renovate the top floor at a cost of $16,000. Okay. That he completed that work. And later, she hired other contractors to do additional work in the basement of the home. There's a bit of a discrepancy over what that charge was. She submitted receipts, I believe, for $5,000, but it was a little unclear whether or not she paid the full $5,000. I think the trial court allowed a portion of it. But either way, the damages that she herself testified to amount to nowhere near $300,000, including the personal property that she testified that she had to replace, including tens of thousands of dollars for clothing for her and her daughter. So the record does not support Ms. Davis' argument that the $300,000 was only for the top floor of her home. She also has some inconsistent statements with regard to whether or not she actually completed renovations in the home. She, in her own words, also testified she took advantage of the fact that the walls and everything were removed from the home because she never had A.C. and she wanted to upgrade the plumbing and electrical. So she said, in her own words, there's mold, the floors have to come out, let's do this. Since the walls are open, the rain is here, the floors are damaged, let's do this. How much is this going to cost? And who is she saying this to? She is telling that is from the recorded statement she gave to the Hartford representative just a few months after. She's referring to what her thought process is, I believe, when she was deciding what work to move forward with. So, again, it's our position she's already been fully compensated. I believe the case law supports it. The trial court denied the set-off based on two cases that are inapposite to this case. Both of those cases involve multiple plaintiffs. And the court said we couldn't figure out the allocation of the funds between the plaintiffs, so we can't say for sure if they were properly compensated. That is not the case here. She's a single plaintiff. She received a single payment. It's absolutely possible to allocate how much of that money went to her. And it's also possible, based on her testimony and the $32,000 in receipts that she produced and submitted into evidence at trial, that her damages are nowhere near $300,000. Getting back to the breach of contract, your representative, CERF pro representative, admitted that CERF pro never expected to get payment for the work that they did from Ms. Davis. I'd like to note that Mr., I believe you're referring to Pat Murphy. Right. And Mr. Murphy testified at his deposition, which is in the record at C-1123, that initially CERF pro did not know that she would ultimately be responsible, but she was. Because most of the work that CERF pro does is subject to an insurance claim. This was slightly different because it was a third-party claim rather than Ms. Davis' own homeowner's insurance claim. He also testified that Hartford was the client. He testified to that, but the contract says otherwise. And unfortunately, this is not in the record, but Mr. Murphy testified at trial that If it's not in the record, it didn't happen. So I refer you back to what he said at his deposition, that although initially they did not expect her to have to pay, that is what ended up happening, and she did get invoice for the work. All right. Anything else? You do have five minutes. Anything else you want to add? So I haven't talked about the conversion claim. Well, I guess I have. I would like to touch on the counterclaims briefly. Briefly? Pardon me? Briefly. I hear you. So CERF Pro's position is that they came in, they dried out the home, they made it possible for her to continue with the reconstruction efforts, and that they should be compensated for that. I will end here so that I don't repeat myself. Okay. Thank you. Morning. Morning. Morning. Unfortunately, I believe you just heard a stunning series of misrepresentations from counsel. And I say that because of a stipulation of facts, which I have in front of me, which is part of the appellate record. As you know, the court record itself was issued by the Supreme Court, and it was not recorded. However, subsequently, and during the course of this appeal, the parties opposed it. Was it an agreed statement of facts or was it a bystander statement? It's a called and agreed statement of facts, and it's a supplement to the appendix that was approved by the court as part of this record. Okay. And we know that what she said is just, what she just said is false. In a number of ways. Because I want, if I, with your indulgence. Misrepresentations. Yes. With your indulgence. Let's not get into characterizations, okay? Fine. All right. I would simply quote directly from the agreed statement of facts, if I may. Paragraph 22, Davis never had any discussion with ServPro about ServPro charging her for any work, nor did they ever discuss any price for its services, any price estimate, or how the cost of ServPro's work might be determined, such as any hourly charge or project cost. Paragraph 25, no price or price estimate was stated in the construction agreement. The construction agreement had blanks with no numbers on it for the fields labeled contract price, initial contract deposit, and cash to be paid upon completion of services as here and after repaired. Paragraph 28, nothing on the face of the construction agreement indicated Davis would be responsible for the cost of its performance. Paragraph 34, none of the forms had any price terms or estimates. This is all in the record, right? This is part of the record. This is stipulated by opposing counsel. Okay. I have a question with regards to the issue about the jury demand and the agreement. If ServPro caught improperly struck the jury demand, then what's the proper relief here? You mean jury waiver? Jury waiver, I'm sorry. I think, unfortunately, the proper relief would be that the case would have to be tried before a jury. Even though we won some things and I would have liked to have held on to those portions of the award, I think in all fairness, there's a different trier of fact which we were entitled to. Doesn't this entire case just boil down to whether or not this authorization is a valid contract? Almost all of it. The part, I think, that doesn't, isn't encompassed with that is the fact that they stole all of her possessions, which is clearly outside. Well, they didn't steal them. They had authority to take them.  She was originally authorizing to take them, right? And so now they're talking about that Dynaclean case. So how do we distinguish Dynaclean? It's unpublished, but. How do we distinguish it? Yeah. The fact that, boy, I mean, there was absolutely no, no matter how you read the documents that Ms. Davis signed, there's absolutely no permission or no hint of any kind that she was giving them permission to just take her property forever. What the document says that she did sign is that they were going to clean the goods to their pre-loss condition. And at trial, their representative couldn't even say whether they'd cleaned it or not. What he did say, and which, again, is in the stipulation. Is that in the record, though, what you just said about what was said at trial? I'm not sure about that. What is in the stipulation, though, which is part of the record, is that there was demand for the return, and it was never granted. And that's really the crux of conversion, not whether you let someone take it for a limited purpose, but whether they refuse to return it to you when you've got a right to return. What about this issue with the $300,000? I mean, they're claiming that Ms. Davis was made whole. Yeah, they have no idea what that settlement was because, and I appreciate you asking about that. They specifically declined to participate in the settlement because they said, we want to get our money out that we think we are due, and unless you want to pay us money, we're not going to settle anything. And that's why they weren't part of the settlement. They've never seen the settlement agreement. And as Justice Walker, I think, correctly pointed out, the claims that were settled against the other defendants are completely distinct. There's been one damage, which SERPRA didn't cause. The damage that SERPRA caused was, number one, converting 484 line items of property, everything in her house, and also demolishing large portions of the house without repairing it, again, which the other defendants had no part of. So the idea that this agreement that she's never even seen somehow covered SERPRA's damages, which, I mean, they're – Do they still have possession of her items? As far as we know, they still do. If she wanted her personal items back, why didn't she just file a replevant action? I think by the time this really became ripe as a dispute, and it became apparent that nothing was going to get resolved peacefully, a lot of that stuff – I mean, it was years old by then, so a lot of it she had had to replace. Some of it – I mean, it included things like food and medicine, as well as appliances, and, I mean, her bed that she had had to replace a bed, and linens, and clothing, and all this stuff. And, you know, I mean, once you've bought a couch to replace your present couch, you don't necessarily want your old couch that they've – That's not the last items that she couldn't bear to part with. Absolutely. And they've refused to return those items to file a replevant action. That may have been a possible form of relief, but, I mean, the biggest – I mean, honestly, the biggest damage, in my view, was that they simply – essentially made her homeless. I mean, they took everything from her. And so at that point, it's like, pay for it, you know? That's really what it comes down to. I just want to reiterate on those first stipulations, that they never provided any estimate to Ms. Davis. The notion she – the counsel stated that we can't possibly give anyone an estimate is baloney on its face. I mean, they wouldn't be doing this work if they had no idea whether they were going to be paid, how much they were going to be paid. They gave the estimate to Hartford alone, and I think that is in the record, and especially – and also the notion that they had initially intended and had initially billed Ms. Davis is also false, and that is also in the record. There is a document that was called during the trial, a DASH report, which is in the record, which is basically a log of the work as it went on. It's about 15 pages. And when you read the entries there towards the end of the process, it says, we sent the bill to Hartford, they made some adjustments to it, they still didn't pay it. They told us we should therefore send the bill to Ms. Davis, and until then, we didn't do it. So the whole notion that Davis was always a contractual pardon to this is nonsense. We've got – I mean, I don't know. There's a whole bunch of other – You didn't seek leave of court to file your claim for punitive damages, right? Sorry? You didn't seek leave of court to file your claim for punitive damages. That is correct. Yes. We've talked about conversion. Yeah. I'll be happy to address – I'm sorry. Punitive damages. The Court denied punitive damages on the basis of Section 604.1. On the basis of what? On the basis of 604 – Section 604.1 of the Code of Civil Procedure, which says basically that you're not supposed to include claims for punitive damages. Without leave of court. I'm sorry? Without leave of court. Without leave of court. And the way that Judge Golden interpreted it, and she did cite a case to that effect also, is that as long as there is any kind of negligence claim as part of the complaint, you ought to get leave of court for any punitive damage claim. However, there were subsequent cases that the Court – that Judge Golden did not look at or cite, including Fiala v. Bickford Sr. Livingbrook, which we cited. Counsel, you're going to have to speak up a little bit. I'm sorry, yes. The microphone doesn't amplify. Correct. I'm sorry. It only records. I appreciate that. We cited a case subsequent to the LaSalle National Bank v. Willis case that Judge Golden cited. And that case we cited was Fiala v. Bickford Sr. Livingbrook, in which the Court reached an opposite conclusion. And it basically said – it really fixed on the word, what is an action, which is in the Section 604.1. And what it said was that in a negligence action, you have to get leave of court for a punitive damage claim. But in an action which is interpreted as basically a cause of action rather than a legal action, as a lawsuit, you do not have to get leave of court for an intentional tort to plead punitive damages. And that's what we have here. The – certainly, we believe that the conversion, which was cruel to take everything that she used and never heard of. I would dispense with the characterizations.  All right? I only warned you once. We believe that that would warrant punitive damages and that the Court should not have precipitously refused to enter – to rule out punitive damages based on Section 604.1. Because both the Fiala case and another case we cited, which was Courtney v. 5746 North Sheridan, LLC, both held that punitive damages award could proceed without a Section 604.1 leave of court proceeding, even though there was also a negligence claim in the case, because it's a – because the claim for the intentional tort is a separate cause of action and that doesn't require leave of court. So that's an interesting legal issue, I think, for the Court to determine. How do you respond to, I think, an ultimate question here is, so Judge Golden initially awards some damages in the case. Yes. For conversion and for the negligence claim. And then on motion for reconsideration, she claims – she finds that there was a valid contract. Or no, she actually didn't find a valid contract. She found that the plaintiff had admitted, like a judicial admission in the first complaint, that it was a contract case instead of a tort case. How do you address that? She's dead wrong about that. That doesn't even – Why? That doesn't even relate to what happened at trial. It was simply a – it was simply her post-trial, on reconsideration for the first time, review of the text of the first amended complaint. Is that what the judge said or is that what you're speculating she did? It's not speculation because that – the only basis for her decision on that was that – And since we don't have a transcript here, we can only go by what's in the record. That's why I'm asking you specifically, did the judge say that was her basis or are you just assuming that was her basis? She didn't describe her thought process. All right. Well, then. I'm sorry. But that is the only possible basis. That was the only argument they made, I think. And that was the only possible basis. Okay. And the way – the reason I say it is absolutely false is because in the record is a copy of the first amended complaint on which that conclusion was based. There is not a single reference anywhere in the claim against ServPro which says there was a contract. There is a claim for breach of agreement. Six times it says breach of agreement, not breach of contract, as opposed to in the same document had a claim against coal construction for breach of contract. And it said specifically six times breach of contract. There's a distinction. Obviously, the court is well aware, as any first-year law student is, that there's a difference between an agreement and a contract. But she dismissed her breach of agreement claim. Exactly. And she did it right after ServPro presented their motion to strike the jury demand. I think it was – Yeah. Why did she do that? Because there was no point in proceeding with it because we determined after fully reviewing everything – I mean, the record was – the case was worked up by then that there was no basis for a breach of agreement because there was no contract. And there was – and we didn't meet it, frankly, because we've got – I mean, we had the negligence and the conversion. Any other questions? No. Okay. You want to sum up? I struggled somewhat in thinking about what we were really seeking from this Court because there were – there are obviously elements of the Court's decision that favor us, and I'd love to hold on to the judgment. But I think, as Justice Walker correctly noted, the most proper – given that we believe that it was wrong to deprive us of a jury trial because it was based entirely on a provision in a document which was not a contract, which didn't have the specific terms necessary for a contract, the proper procedure would have been to allow us from the beginning to have tried the case before a jury, which I think might well have given us a better result in terms of damages. And so that's what we would urge the Court to do.  So thank you.   Rebecca? Yes, Your Honor. I'd like to start by noting that the agreed statement of facts that Mr. Orthower cited pertains to the construction services agreement, which is not the contract that Ms. Davis sued under and not the contract that ServPro sued under. We sued and she sued under the authorization to perform services, which is a totally separate agreement. So I believe that those provisions are irrelevant. I would just like to note that with regard to your question about why not Raplevin, there are some serious allegations here that ServPro is holding on to the remains of Ms. Davis's family members. That is something that this company that I work for would never do. I absolutely believe that a Raplevin lawsuit would have been more appropriate if that is true. Now, with regard to her contention that she was made homeless, I'd like to note that Ms. Davis testified in her deposition, it was her decision to hire the contractor she wanted. I press further for what? For the water mitigation or for the repair? For the repair. And this is in the record at 1639. She said that she was told that after ServPro started the work at the home, she could choose the contractor that was going to do the repair work. So she clearly knew ServPro was not going to do the repair work. She had the choice of who she was going to choose to do it and ultimately chose not ServPro. And is that in the record? It is, Your Honor. This is in the record in Ms. Davis's deposition. This is starting at page, in the record, 1639 is her testimony. Also, I'd like to address the question that Justice Walker asked me earlier. How do I know if she understood the contract? She testified that it's not that she didn't understand. She just didn't get copies. And that is in her deposition transcript in the record at 1640. Do we know if anybody explained it to her? Whether they presented it to her in terms of what was in the agreement? Her testimony is that she does recall looking at the documents and signing them. And that it's, as I just said, not that she didn't understand them. She just didn't get copies of them at the time. Did she sign them on an iPad? Yes. And so when you, earlier, a moment ago, you mentioned that she stated in her deposition, I think I'll paraphrase you, that she, it wasn't that she didn't understand, it's that she never got copies. So then it's your contention that she understood, based upon looking at the iPad, what the conditions were? Based on her testimony that she, it's not that she didn't understand. I see. So, yes, I believe she did understand what she was signing. I see. And I believe that's why she brought a breach of contract claim, attaching that contract to her verified complaint. I'd like to just briefly note that I... Didn't even Mr. Murphy testify that the authorization was just to make sure that CertPro was allowed into the home and that Hartford was his client? He characterized it that way, but a plain reading of the contract says otherwise. I'd also like to note that Mr. Orgauer makes an argument that it's, they've alleged breach of agreement, not breach of contract. I'd like to refer your honors to the negligence claim in the first amended complaint, which is put in the alternative to the breach of contract claim, and it specifically says that if the trial court should find that there was no contract or commercial relationship between Ms. Davis and CertPro, or in the event that any contract or commercial relationship was between CertPro and Hartford only and not Ms. Davis. So I don't believe that our... That's not the operative complaint, though. I mean, those are... Yes, it is. This is the first amended complaint. Oh, I'm sorry. I'm sorry. I misunderstood you. My apologies. It's okay. So I believe it's clear she intended to bring a breach of contract claim. She brought a breach of contract claim. She moved her summary judgment on the breach of contract claim. And I think it wasn't until I asserted the jury waiver provision that Ms. Davis decided she didn't want to have a contract anymore and dismissed the breach of contract claim the day after I filed the motion to strike the jury waiver. I'd also just briefly like to note there were other prior orders entered in the case that found the contract to be valid and enforceable. Those are orders that I cited to when I brought the motion to reconsider that Judge Golden ultimately agreed with. So in conclusion... Well, before you sum up... Yes. So I just want to understand, getting back to the question about Mr. Murphy, he was an executive with SurfPro, wasn't he? No, he was a project manager. He was a project manager. Yes. So he's a person that was well-informed in terms of work and agreements that the party entered into, right? Well, he's certainly not a lawyer, but as I stated earlier, most of the work SurfPro does is paid for by insurance proceeds. And so 99% of the time... But that's not answering my question. So, again, as I responded to Justice Walker, the contract says otherwise. Mr. Murphy testified... You use a representative empowered and have an authority with regards to SurfPro, right? Yes. Okay. I believe... It's all one. Okay. So in conclusion, SurfPro is asking this court to reverse the trial court's finding that there was not a set-off available because we believe that it would be inequitable and a double recovery if Ms. Davis were to receive additional monies for her, what we believe to be a singular loss. We believe that the set-off would take care of the conversion claim, but if not, then we believe that she was not entitled to sentimental value for her personal items for which, as you correctly noted, she could have brought a replevin claim. And finally, SurfPro would ask this court to reverse the trial court's finding that its counterclaim is invalid. Thank you for your time. Thank you. I want to thank counsels for a very interesting case. We will take this matter under advisement, and this court is adjourned.